```
 1                  UNITED STATES DISTRICT COURT

 2                 WESTERN DISTRICT OF WASHINGTON

 3                          AT TACOMA

 4     _____

 5     JOSEPH A. NELSON,              )
       individually and as Personal  )
 6     Representative of the ESTATE   )
       OF JOEL A. NELSON, and its     )
 7     statutory beneficiaries,       )
                                      )
 8            Plaintiff,              )
                                      )
 9            vs.                     )  No. 3:18-cv-05184-RBL
                                      )
10     THURSTON COUNTY, a Washington  )
       municipality; RODNEY T.        )
11     DITRICH, individually; JOHN D. )
       SNAZA, individually; and DOES  )
12     1 through 15, individually,    )
                                      )
13            Defendants.             )

14     _____

15          VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

16                             OF

17                       JOHN D. SNAZA

18     _____

19                        9:02 A.M.

20                    SEPTEMBER 17, 2018

21              2674 R.W. JOHNSON BOULEVARD SW

22                   TUMWATER, WASHINGTON

23

24     REPORTED BY: CHERYL O. SPRY, CCR No. 2226

25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1     A.    It wasn't a reason that was explained to me.

2     One, it was explained, is money.  But Sheriff Kimball

3     never told me that, it was some of the chiefs that had

4     told me that.

5           And it's -- being accredited is something that

6     you -- it's something as an executive to be very proud

7     of.

8     Q.    But what does it mean, though?

9     A.    It means it's something that you hold yourself

10    to a higher standard.

11    Q.    So then are you saying that the standards of

12    the Washington Association of Sheriffs and Police Chiefs

13    are standards that Thurston County Sheriff's department

14    is held to?

15    A.    Well, we all hold ourselves to a high

16    standard.  It -- what the accreditation is -- is a

17    standard that we put on ourselves to be better than as

18    good as we are today.

19    Q.    So it's a policy that you've adopted?

20    A.    It's -- it's something that I believe as a

21    Sheriff that it's important for us to strive, always

22    keep on striving to be better than what we are today.

23    Q.    But isn't it your responsibility to set policy

24    in regards to law enforcement in Thurston County?  Isn't

25    that your -- your responsibility?



206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    but -- I don't know if I answered that question

2    appropriately or not.

3         Q.   Well, I guess I'll have to ask another

4    question and we'll see.

5         A.   I apologize for that.

6         Q.   The -- you said there was a presentation on

7    the investigation?

8         A.   Once the investigation is completed, there is

9    a presentation record of the -- of the entire incident.

10   And it is presented to myself, my staff, and the

11   Prosecutor.

12        Q.   And who was involved in that meeting?

13        A.   Myself, the undersheriff.

14        Q.   And his name, please?

15        A.   Sorry.  Tim Braniff.

16        Q.   Okay.

17        A.   Chief Dave Pearsall, I believe Chief Brad

18   Watkins, Captain Gordon Phillips.  The presenters from

19   Lewis County, who I couldn't tell you all of them who

20   did that, the Prosecutor, Jon Tunheim, I believe the

21   deputy prosecutor, Jeff Lippert.  I don't know if -- I

22   can't recall if there was another prosecutor there or

23   not.

24        Q.   Was Mr. Toynbee there?

25        A.   That -- that would -- that would make sense,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   if he was there.  He's a -- he's a judge now in Lewis

2   County, so I can't remember.  I believe he is the one

3   who -- I believe he was, if you said his name, I believe

4   he was there present.

5          And what happens is that in the presentation,

6   we're briefed on the findings of the incident.  And then

7   it is then reviewed by the Prosecutor of the entire --

8   given the entire investigation packet, not just the

9   PowerPoint presentation but the entire packet.  And that

10  Prosecutor reviews all of those materials.

11      Q.   For what purpose?

12      A.   Well, I suppose that in any presentation,

13  however it may appear, maybe there was or isn't -- was

14  or was not things that weren't represented to what the

15  Prosecutor would look at this case or this incident.

16  And the Prosecutor wants to do a thorough investigation

17  to ensure that, at the time, he was doing his job.

18      Q.   Okay.  So what if there was a determination by

19  you or the Prosecutor that there was some questions left

20  unanswered during the investigation, what would occur in

21  that event?

22      A.   Those would be presented to the Prosecutor.

23      Q.   By who?

24      A.   Well, by the audience that was there, if there

25  was a question about it.  There are -- I can't -- can't

1    reason is is being a SWAT operator, I never fully loaded

2    my magazine all the way to the top.

3         Q.    (BY MR. CLOUD:)  Your written policy says that

4    they're supposed to carry their weapon fully loaded with

5    one in the cylinder and a fully loaded magazine; does it

6    not?

7         A.    Yes.

8         Q.    And so therefore, if Ditrich was not carrying

9    a full magazine, he was violating the written policy; is

10   that correct?

11        A.    As I said, it's a broad policy.  It depends

12   on -- the way I would say or how my policy is, that do I

13   expect a loaded magazine?  Yes.

14        Q.    And one in the cylinder; correct?

15        A.    And one in the cylinder.

16        Q.    You do, don't you?

17        A.    I do not personally do that, but it's because

18   of my training throughout the years that I do not have a

19   magazine that's topped off to the top with one in the

20   chamber.

21             It is not uncommon for us to have fully, if

22   you will, at-capacity magazines and then one goes in the

23   chamber.  Then your mag is not fully loaded, because if

24   you wanted a fully loaded magazine, that means that you

25   would put one in the chamber and then you would eject

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              And so I do not know, those things that you
 2    said I am not aware of.
 3         Q.    But you exonerated him.  Why aren't you aware
 4    of that?
 5              MR. JACKSON:  I object to the form of the
 6    question.  He didn't find policy violations.  There is a
 7    difference.
 8              But answer it, if you can.
 9         A.    So exonerating him for being involved in the
10    shooting, he was investigated.  The Prosecutor's Office
11    cleared him of any criminal wrongdoing.  He was
12    investigated through -- through an IA investigation,
13    internal investigation, and he was found not to have
14    violated any policy.
15         Q.    (BY MR. CLOUD:)  Okay.  So does the
16    Prosecutor's Office routinely determine criminal charges
17    before they get laboratory tests back?
18         A.    That part I could not answer.  I don't -- I
19    don't know the process of the Prosecutor's Office.
20         Q.    What's the point of sending this material into
21    the state crime lab if nobody is going to even read the
22    reports?
23              MR. KAMERRER:  Object to the form of the
24    question.
25              MR. JACKSON:  I join.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              MR. KAMERRER:  Object to the form of the

 2     question.

 3              MR. JACKSON:  I object to the form of the

 4     question and its compound nature.

 5         A.   From my understanding, the statements by

 6     Deputy Ditrich on how the shots were fired from a moving

 7     vehicle when he's standing on the running board, I can't

 8     explain what the succession looked like, one after the

 9     other or rapid fire.  I couldn't explain that.  I can

10     say that I do believe that Deputy Ditrich did fire those

11     three rounds, though.

12         Q.   (BY MR. CLOUD:)  Right.  And they're not

13     consistent.  So therefore, his story is not believable;

14     is it?

15              MR. JACKSON:  I object to the form of the

16     question.

17         A.   I don't -- I don't believe that.  A -- the

18     evidence that, whether it's collected or not, however it

19     is, I don't know how subjective the evidence is or not.

20     I don't know the preciseness of it.  And I'm basing the

21     information based off of what Deputy Ditrich stated.

22              And unfortunately right now, that's what I

23     have, and then the evidence other than that, besides his

24     statement.

25         Q.   How come the evidence that was on and in the
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   vehicle, the patrol vehicle was destroyed by Thurston

2   County?

3           MR. KAMERRER:  Object to the form of the

4   question.

5           MR. JACKSON:  I join.

6       A.   So are you saying -- or, I'm sorry, asking me,

7   are you asking that after all the evidence was collected

8   out of the vehicle and photographed, what I did with the

9   vehicle?  Is that what you're asking?

10      Q.   (BY MR. CLOUD:)  No.  Why was the blood

11  splatter evidence specifically removed?

12      A.   I'm only surmising, because they were done

13  getting evidence from the vehicle.

14      Q.   All right.  So let's turn this around.  Let's

15  assume that instead of Joel Nelson being killed, Officer

16  Ditrich was killed in the incident.  Would you have had

17  the vehicle cleaned, sanitized, repaired and sold within

18  a matter of weeks?

19          MR. KAMERRER:  Object to the form of the

20  question.

21          MR. JACKSON:  I join.

22      A.   I don't know the exact time frame when I had

23  the vehicle removed from fleet.  I made it very clear --

24  so with Deputy Ditrich, if he had been killed in that

25  vehicle, I would not have kept that vehicle, either.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

JOHN D. SNAZA; September 17, 2018                                      71

1    But I did not want that vehicle in my fleet.  And I made

2    it very clear; you do whatever you want with that

3    vehicle, whether it sits out in the parking lot or

4    whether you sell it, but it is not going back in my

5    fleet.

6         Q.   (BY MR. CLOUD:)  Why wasn't the evidence, the

7    hood of the car analyzed for gunshot residue before you

8    had it cleaned?

9         A.   I can only surmise that the investigation was

10   completed on the vehicle, and that the vehicle was no

11   longer needed.

12        Q.   So as we reflect back on your testimony about

13   the investigation heretofore, essentially your -- your

14   decision and the department's decision to exonerate

15   Deputy Ditrich relies solely upon his word on the number

16   of shots he fired; isn't that correct?

17             MR. KAMERRER:  Objection.

18             MR. JACKSON:  Objection.  Well, I join your

19   objection.

20             MR. KAMERRER:  I join yours.

21        A.   Where -- we looked at it as that, first off,

22   the criminal side, there was found to be no criminal

23   violation by the Prosecutor.  When we did our internal,

24   we found no policy violation.  So that was the two

25   determining factors.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

JOHN D. SNAZA; September 17, 2018                                72

1          Now, what I'm saying about the vehicle is if

2     they're done with the vehicle in the evidence process, I

3     did not want that vehicle in my fleet.

4          Q.   (BY MR. CLOUD:)   Why?

5          A.   Why?  Because I personally believe that it's a

6     remembrance of how tough our job is.  And I don't

7     believe anybody needs that remembrance every day that

8     they drive that vehicle.

9          Q.   Weren't you really trying to just get rid of

10     the evidence?

11          MR. JACKSON:  I object to the form of the

12     question as argumentative.

13          A.   Again, I know that you have an upset father

14     and you're representing him.

15          Q.   (BY MR. CLOUD:)   We have an upset community.

16          MR. JACKSON:  Will you let the witness answer

17     the question, please?

18          A.   I believe that a community is upset that law

19     enforcement has to do their job.  And it isn't --

20     doesn't always look pretty.  There is not always a good

21     result for everybody on that end.

22          I would say that it's unfortunate, it's

23     horrible, and there is no police officer that ever wants

24     to be confronted with that, or an individual who's had

25     to do that in their past, I guarantee you that.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Q.    (BY MR. CLOUD:)   You've made --

2    A.    But I do not -- I want to make clear, this

3    evidence thing that you want to say whether I want to

4    get rid of it, I made it very clear I don't want that

5    vehicle in my fleet.

6    Q.    So you made a deliberate choice to destroy

7    evidence of a possible crime involving your Deputy

8    Ditrich, did you not?

9            MR. KAMERRER:   Object to the form.

10           MR. JACKSON:   I join.

11   A.    I made a choice to get rid of a piece of

12   equipment after evidence was obtained from the vehicle,

13   and I said that I'm not using that vehicle again.

14   Q.    (BY MR. CLOUD:)   Why haven't you considered

15   the possibility that Ditrich committed the crime of

16   manslaughter in the first degree?

17           MR. KAMERRER:   Object to the form of the

18   question.

19           MR. JACKSON:   I join.

20   A.    I would say that I'm not the criminal

21   prosecutor.   I've not thought of that since the

22   Prosecutor's Office reviewed all the evidence and

23   determined that there was no crime.

24   Q.    (BY MR. CLOUD:)   Well, they didn't review all

25   the evidence, did they, because the evidence was not all

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.   So would it be fair to call your relationship

2  a friendly professional acquaintance?

3      A.   Friendly, friendly and friends.

4      Q.   Okay.

5      A.   We are friends.

6      Q.   Okay, a little more of a friendship.  Okay,

7  all right.  What about Deputy Ditrich, what

8  relationship, if any, did you have with him before the

9  incident of January 5th, 2016?

10     A.   I've known Deputy Ditrich when he worked for

11 Lacey Police Department.

12     Q.   Did you work with him?

13     A.   I worked -- we probably showed up on the same

14 calls together, but then he got hired on by the

15 Sheriff's Office, and then we worked together.  And then

16 we worked together as -- on the SWAT team together.  And

17 I want to say he came in right before I left in the task

18 force, Narcotics Task Force.  And then we have camped

19 together before back in the late 90s, early 2000.

20     Q.   Family camping?

21     A.   Yes, with friends, other friends from the

22 agency.

23     Q.   How many times?

24     A.   Once.

25     Q.   Any social interaction outside of work in the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   last ten years?
 2       A.   No.  I met with him in regards to a staffing
 3   schedule when I was running for Sheriff.
 4       Q.   What does that mean?
 5       A.   The association wanted to propose a 10/40
 6   schedule, a shift schedule, because at that time when I
 7   was running, we were working a five/two, five/three.
 8   Sorry.
 9       Q.   Could we be a little more clear for the
10   record?  So ten -- four tens would be four days and ten
11   hours; is that correct?
12       A.   Yes.  I apologize.  So before we were working
13   five eight-hour shifts, two days off, five eight-hour
14   shifts, three days off.
15           What Rod was wanting to propose was that you
16   work four ten-hour-and-40-minute shifts with -- with
17   four days off, four ten-hour-and-40-minute shifts with
18   four days off, and then ten-hour-40-minute shifts with
19   five days off.  And you would have overlapping -- you
20   would have shift overlapping every two -- or two hours.
21   So before you got off, if I got off work at 8:00, their
22   new shift would come on at 6:00 and do that same, so
23   there is always a two-hour where you always had more
24   deputies.
25           And then with that schedule, it was able to
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   have -- every other Wednesday you would have training

2   days for all your deputies.  So it alleviated setting

3   aside training days for mandatory training or something

4   like that.  So you always had that opportunity to train

5   during the overlapping Wednesdays or do emphasis.

6           And so that was his proposal.  And he was,

7   with the association, wanting to have that and thought

8   that would be a great working schedule.

9       Q.   And when did that occur?

10      A.   Oh, that was 2010, sometime during that time I

11  was running for Sheriff.

12      Q.   Was that proposal adopted?

13      A.   Yes, it was adopted I believe in June.

14      Q.   Before you got elected?

15      A.   No, after I got elected.

16      Q.   And did he make the proposal to you before you

17  were elected or after you got elected?

18      A.   It was before.  It was when I was running for

19  Sheriff.  It was a -- the big thing was is how do you

20  get more deputies on the road?  And that was one way to

21  be able to do that.

22      Q.   Was that something that was originated from

23  the union itself, or was that Deputy Ditrich doing it on

24  its own?

25      A.   It was the association pushing for it.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.    And what was Deputy Ditrich's role in the

2   association?

3      A.    I know at one time he was -- well, I thought

4   he was a president of the association, but I know he was

5   in -- part of the bargaining unit.  So I couldn't tell

6   you for sure if he was the president or not, but he was

7   in the bargaining unit.

8      Q.    So he was some sort of an officer within the

9   union?

10     A.    Yes.

11     Q.    Do you think he ever was president of the

12  union?

13     A.    I'm trying to go back.  And I could not tell

14  you whether he was or not, but I know that he was part

15  of the bargaining unit.

16     Q.    So he was a leader in the union?

17     A.    Yes.

18     Q.    Was he a leader amongst the deputies as well?

19     A.    I believe he was.

20     Q.    Okay.  And --

21     A.    Still is.  Sorry.

22     Q.    That's okay.

23           So you're familiar with the concept of Brady

24  evidence, in quotes, in criminal law, are you not?

25     A.    Are you referring to the Brady law?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    question.

2        A.    Well, when you're asked who you are and you

3    lie about who you are, then yes, it is a crime.

4        Q.    (BY MR. CLOUD:)  Even though the Supreme Court

5    of Washington State has said that that alone is not

6    enough to -- or the Supreme Court of Washington State

7    has said that that alone is not enough to provide

8    probable cause for an arrest?

9            MR. KAMERRER:  Object to the form of the

10   question.

11           MR. JACKSON:  I join.

12       A.    But that wasn't alone by itself.

13       Q.    (BY MR. CLOUD:)  What was it, what was

14   additional to it?

15       A.    Was that the person was being contacted

16   because, as a suspicious person, believing that that

17   individual might be burglarizing or stealing from that

18   residence, or wanting to burglarize, gave Deputy Ditrich

19   a reason to contact the individual and ask him questions

20   about why he's there.

21       Q.    Do you believe that Officer Ditrich had

22   probable cause to arrest him when he did arrest him?

23       A.    Yes.

24       Q.    What was the probable cause?

25       A.    False information and not being able to say

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

1  why he was there or why he wasn't there, and believing

2  that --

3       Q.   What crime has he committed?

4            MR. JACKSON:  Counsel, you need to let the

5  witness answer the question.  You keep interrupting him

6  before he finishes.

7            MR. CLOUD:  I can interrupt him if I want to

8  follow up on a question, and if, for instance, when he

9  puts in an acronym or something else.  And I don't

10  believe I'm interrupting him.

11       Q.   (BY MR. CLOUD:)  But go ahead, finish your

12  answer, if you'd like.

13       A.   I believe that, based on the information, that

14  Deputy Ditrich was contacting a person that was looking

15  at wanting to burglarize the residence, steal something,

16  I don't know.  But he provided false information.

17       Q.   So he was arrested for giving a false name.

18  And you say that that's proper.  Is that your position?

19       A.   Not --

20            MR. KAMERRER:  Object to the form of the

21  question.

22       A.   Not the false information part.  People lie to

23  law enforcement all the time.  That's just not a crime,

24  to lie.

25       Q.   (BY MR. CLOUD:)  And officers are permitted to

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  lie to suspects, aren't they?

2          MR. JACKSON:  Again, you have interrupted the

3  witness before he's answered the question.  Please allow

4  him to finish.

5          MR. CLOUD:  In reading his reactions, I

6  thought he was finished.

7      A.   Okay.  Where -- providing false information is

8  not necessarily a crime, but it is a reason to detain a

9  person, because you believe that other crimes may or --

10 may have been -- may not or may have been committed, so

11 detaining him to find out who -- what his identity is

12 and why he's there.

13     Q.   But he was under arrest, he wasn't just

14 detained?

15     A.   He wasn't free to leave.

16     Q.   The officer had put him under arrest?

17     A.   He was under arrest after providing the wrong

18 information about who he was.

19     Q.   So you're ratifying his decision to arrest

20 Mr. Nelson for giving a false name, aren't you?

21         MR. KAMERRER:  Object to the form of the

22 question.

23         MR. JACKSON:  I join.

24     A.   No.  The question that I have is why didn't he

25 just give his information?


206 622.6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

JOHN D. SNAZA; September 17, 2018                                    131

1       Q.   (BY MR. CLOUD:)   No, that's not the question.

2   The question is what authority did your officer have to

3   arrest Mr. Joel Nelson on January 5th, 2016?   What is

4   the authority?

5           MR. KAMERRER:   Objection; asked and answered.

6           MR. JACKSON:   And it's argumentative.

7           MR. CLOUD:   He hasn't answered it.

8           MR. JACKSON:   It's still argumentative.

9           MR. CLOUD:   He's got to answer the question.

10      Q.   (BY MR. CLOUD:)   What's the probable cause?

11      A.   That Mr. Nelson may be wanting to commit a

12  crime, may be trying to commit a crime, may be involved

13  in a crime, and the deputy contacted him for that.

14      Q.   Why was he arrested?

15      A.   He was detained and not free to go because he

16  provided false information.

17      Q.   He was arrested at some point.   When do you

18  believe he was arrested?

19      A.   I believe that he would have been arrested

20  when he decided to obstruct the law enforcement officer,

21  Deputy Ditrich, in his investigation for obstruction,

22  because he provided a name that was not accurate.

23      Q.   So you believe that he was properly arrested

24  for giving a false name.   Is that your testimony?

25      A.   For obstructing.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.    Is that your testimony?

 2        A.    Yes.

 3              MR. KAMERRER:  Objection.  It's asked and

 4  answered.

 5        Q.    (BY MR. CLOUD:)  And the sole obstructing that

 6  he did was giving a false name; correct?

 7              MR. KAMERRER:  Object to the form of the

 8  question.

 9        A.    No.  So I know that whatever person's opinion

10  is of how you're being contacted, the law does state

11  that we're allowed to contact people for suspicious

12  activity.  And he believed that Mr. Nelson was

13  committing a bad act.  And Mr. Nelson at the time

14  decided not to say who he was.

15        Q.    (BY MR. CLOUD:)  And for that you say that he

16  was properly and legally arrested under the Constitution

17  of the United States; is that correct?

18              MR. KAMERRER:  Object to the form.

19        A.    I'm saying he was detained and not free to go.

20        Q.    (BY MR. CLOUD:)  What's the difference between

21  that and arrest?

22              MR. KAMERRER:  Object to the form of the

23  question.

24              MR. JACKSON:  I join.

25        A.    Well, when you're under arrest means you're
```

206 622 6675 | 800 331 6973
production@yomreporting.com
www.yomreporting.com

```
1    told you're under arrest.  Being told you're not free to
2    go, you're not free to go.
3         Q.   (BY MR. CLOUD:)  Aren't you under arrest when
4    you're not free to go and somebody has a Taser aimed at
5    your butt?
6         A.   No.
7              MR. KAMERRER:  Object to the form of the
8    question.
9         Q.   (BY MR. CLOUD:)  That's not under arrest --
10        A.   No.
11        Q.   -- in your opinion?
12             MR. KAMERRER:  Object to the form of the
13   question.
14        A.   I said no.
15        Q.   (BY MR. CLOUD:)  Do you know what probable
16   cause is?
17        A.   Yes.
18        Q.   What is it?
19        A.   I believe that a person has or is about to
20   commit a crime.
21        Q.   What crime was he about to do?
22        A.   Well, right then and there, possibly
23   burglarize that home.
24        Q.   So was there probable cause to arrest him for
25   an attempt to commit a burglary?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

JOHN D. SNAZA; September 17, 2018                                    134

```
 1        A.   He was detained.

 2        Q.   He was arrested.

 3             MR. KAMERRER:  Object to the form of the

 4   question.

 5        A.   Okay, that's --

 6             MR. JACKSON:  Counsel, you are arguing with

 7   this witness for no purpose.

 8             MR. CLOUD:  Well, he's talking nonsense.

 9             MR. JACKSON:  Well, you don't get to make that

10   statement.  Your job is to ask him questions, his job is

11   to answer it.  You can keep your judgments to yourself.

12             MR. CLOUD:  I'm trying to figure out if he has

13   even a basic understanding of the law in relation to

14   probable cause for arrest.  And he doesn't apparently

15   have that understanding.

16             MR. JACKSON:  Well, if you've already made

17   that determination, then you should move on and ask

18   something else.

19             MR. CLOUD:  I'm giving him the benefit of the

20   doubt.

21        Q.   (BY MR. CLOUD:)  So let's go over this.

22   What's the probable cause, Sheriff Snaza, for the arrest

23   of my client's son?

24             MR. JACKSON:  The question has been asked and

25   answered three times.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1          Q.    (BY MR. CLOUD:)   Everything you can tell us.

2    Right?   Once and for all.   What's the justification

3    legally?   What's the probable cause for this arrest?

4          A.    That Deputy Ditrich believed that Mr. Nelson

5    was or had committed a crime on that property, and that

6    he was being detained to find out who he is and what

7    he's doing there and if he has committed a crime there

8    or not.

9          Q.    At what point was Deputy Ditrich -- or at what

10   point did Deputy Ditrich, in your opinion, arrest

11   Mr. Nelson?

12         A.    I don't even know if Deputy Ditrich had the

13   opportunity to make an arrest.

14         Q.    So you don't believe he was arrested; is that

15   correct?

16         A.    I believe he was detained.

17         Q.    So you don't believe he was arrested?   Tell us

18   whether he was arrested or not.

19         A.    Well, at the time, what was he under arrest

20   for?

21         Q.    You tell me.

22         A.    Well, he was being detained, as far as I

23   understand this case to be.

24         Q.    So you don't believe he was arrested at all?

25         A.    I believe that once he was found out who he

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1    was and that he had warrants for his arrest out of
 2    Lacey, yeah.
 3         Q.   But your officer had no idea he had warrants
 4    for arrest out of Lacey?
 5              MR. KAMERRER:  Object to the form of the
 6    question.
 7         A.   Then he wasn't free to go.
 8         Q.   (BY MR. CLOUD:)  So essentially, you're
 9    sanctioning Officer Ditrich's decision to detain and
10    possibly arrest, depending upon your point of view, Joel
11    Nelson?
12         A.   Yes.
13         Q.   And you believe that that comports with his
14    training?
15         A.   Yes.
16         Q.   And you believe that that comports with the
17    Constitution of the United States?
18         A.   Yes.
19         Q.   And you believe it comports with the laws of
20    the United States?
21         A.   The laws of the State of Washington, yes.
22         Q.   No, I said the laws of the United States.  And
23    I'm going to go into the Constitution of Washington.
24         A.   I would say yes, then.
25         Q.   And that you believe that Officer Ditrich's
```


206 622.6875 | 800 831.6973
production@yomreporting.com
www.yomreporting.com

JOHN D. SNAZA; September 17, 2018                                137

```
 1    actions complied with the Constitution of the State of

 2    Washington?

 3         A.   Yes.

 4         Q.   And you believe that the actions of Deputy

 5    Ditrich complied with the laws of the State of

 6    Washington?

 7         A.   Yes.

 8         Q.   And the laws on arrest in the State of

 9    Washington?

10         A.   On, A, being able to detain an individual for

11    investigation.

12         Q.   Pardon me?

13         A.   To detain a person for investigation, yes.

14         Q.   Well, Deputy Ditrich already said in his

15    statement that he was going to arrest him, and he moved

16    in to arrest him.  Did you read that portion of the

17    statement?

18         A.   Well, the part is is that when Deputy Ditrich

19    said he was going to arrest him, it didn't say whether

20    or not he told Mr. Nelson that he was under arrest.

21         Q.   So you're saying that a person isn't under

22    arrest until the officer says they're under arrest?

23         A.   Uh-huh.

24         Q.   The actions of the officer do not determine

25    whether a person is under arrest, is that what you're
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    saying, it's only the words?

2         A.   The actions of an officer telling somebody

3    that they're not free to go is where I'm saying that

4    you're not free to go.  If you're under arrest, then

5    they'll tell you you're under arrest.

6         Q.   And you're not free to go, are you?

7         A.   He wasn't free to go once he was contacted.

8         Q.   So what's the difference between a detention

9    in your world and an arrest in your world?

10         MR. JACKSON:  I object to the form of the

11    question in this world.

12         A.   So I can -- we can complete an investigation

13    to --

14         Q.   (BY MR. CLOUD:)  I wish you would.

15         MR. KAMERRER:  Object to the form of the

16    question.

17         A.   -- to detain somebody.

18         MR. CLOUD:  We're asking him to complete an

19    investigation, if that isn't clear.  We are.

20         MR. JACKSON:  Why are you arguing with us?

21         MR. CLOUD:  Because you guys have completely

22    covered up a potential second-degree murder or something

23    less.  And we're not going to stand for it.

24         MR. JACKSON:  Can we go off the record for a

25    second?

206 622 6975 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.    Okay.  And let's see.  Where was I?  Oh, yeah,

2    I wanted to question a little bit, what is the Thurston

3    County Sheriff's Office Office of Professional

4    Standards?

5        A.    That's the IA process that --

6        Q.    The internal --

7        A.    Internal --

8        Q.    -- affairs?

9        A.    Like an internal affairs, but we call it the

10   Office of Professional Standards --

11       Q.    Okay.

12       A.    -- because it goes along with internal affairs

13   documentation, so -- but when I got elected Sheriff, I

14   created this position.

15       Q.    Okay.  And so describe how that office is

16   organized, the Thurston County Sheriff's Office Office

17   of Professional Standards.  Who is in charge of that

18   office?

19       A.    The undersheriff, sergeant, there is a

20   sergeant who is the -- who is the, if you will, IA or

21   Office of Professional Standards.  And at this current

22   time, it's Sergeant Hirte, but during this time it was

23   Sergeant Ken Clark.

24       Q.    Ken Clark?

25       A.    Yes, sir, Sergeant Ken Clark.  And he was in

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

JOHN D. SNAZA; September 17, 2018                                                151

1   charge of this for policy, to decide or find out if

2   there had been any policy violations.

3       Q.   Okay.  So then if I can rephrase your

4   testimony, then, you're saying that the Office of

5   Professional Standards, through its individual Ken

6   Clark, was responsible for doing the investigation into

7   whether or not policies and procedures of the Thurston

8   County Sheriff's Office were violated by Deputy Ditrich.

9   Is that a fair summary of what you were trying to tell

10  us?

11      A.   Yes.

12      Q.   Were there any other individuals who were in

13  that particular department as employees or assigned to

14  that department?

15      A.   On this, no, there is not.  And that

16  individual reports directly to the undersheriff.

17      Q.   Okay.  So basically, the Office of

18  Professional Standards pertaining to the investigation

19  of Joel Nelson's death consisted of one individual, Ken

20  Clark, who was supervised by Undersheriff Braniff?

21      A.   Yes.

22      Q.   Okay.  And so Mr. Clark was a sergeant at the

23  time; is that correct?

24      A.   Yes.

25      Q.   And so why did you choose him to do that role?


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1          MR. KAMERRER:  Object to the form of the

2     question.

3          MR. JACKSON:  I join.

4     A.   I couldn't say anything about how the vehicle

5     was examined, just based on the evidence that was

6     gathered and statements given.  But I don't know what

7     all it was used for, whether it was reconstruction or

8     not of the incident.

9     Q.   (BY MR. CLOUD:)  So you have no idea whether

10    there was an accident reconstruction or not?

11         MR. KAMERRER:  Object to the form.

12    A.   I don't know if one of my reconstructionist

13    guys were there or not.

14    Q.   (BY MR. CLOUD:)  Why was the door open when

15    Officer Ditrich got out to see Mr. Nelson?

16    A.   I couldn't tell you that.

17    Q.   That seems kind of negligent to me, I mean, to

18    approach a suspect on the side of the street with your

19    door open and your car running.

20         MR. KAMERRER:  Object to the form of the

21    question.

22         MR. JACKSON:  I object.  It's not a question.

23    A.   I don't know what kind of contact Deputy

24    Ditrich thought he was making at first.

25    Q.   (BY MR. CLOUD:)  Do you tell your deputies

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

JOHN D. SNAZA; September 17, 2018                                        188

1   that they can make contact with suspects while

2   they're -- with their door open and their car running

3   and then leave the car door open while they leave the

4   nearby vicinity of the vehicle?  Is that proper police

5   procedure?

6       A.   I can say that it's not a common thing to do,

7   but it's not something that -- it all depends on the

8   contact, why we're there, what we're doing.  The door is

9   open for felony stops.  What that turns into I don't

10  know, because it could be anything, but whether we're

11  chasing somebody and we leave the door open or whether

12  we're just out making a friendly contact.

13      Q.   So but isn't he saying in this paragraph that,

14  essentially, nobody on the CIIT was in charge of

15  coordinating the gathering of critical contact evidence

16  relating to the vehicles at the scene?  Isn't that what

17  he's really saying?

18           MR. KAMERRER:  Object to the form of the

19  question.

20           MR. JACKSON:  Join.

21      A.   Where is that at?  I'm sorry.

22      Q.   (BY MR. CLOUD:)  It's right here.  Let me show

23  you.

24      A.   Oh, "No comprehensive approach...."  Okay.

25           I would disagree.  And I'm basing that off of

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

JOHN D. SNAZA; September 17, 2018                                          216

```
 1              CORRECTION & SIGNATURE PAGE

 2   RE:  NELSON vs. THURSTON COUNTY, ET AL.

 3        UNITED STATES DISTRICT COURT; No. 3:18-cv-05184-RBL

 4        JOHN D. SNAZA; TAKEN SEPTEMBER 17, 2018

 5            Reported by: CHERYL O. SPRY, CCR No. 2226

 6            I, JOHN D. SNAZA, have read the within

 7   transcript taken SEPTEMBER 17, 2018, and the same is

 8   true and accurate except for any changes and/or

 9   corrections, if any, as follows:

10   PAGE/LINE              CORRECTION                    REASON

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22        Signed at   OLYMPIA            , Washington,

23   on this date:  10-16-18

24

25                                           JOHN D. SNAZA
```

RECEIVED
OCT 2·5 2018
YAMAGUCHI OBIEN MANGIO, LLC
COURT REPORTING

ORIGINAL



206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1                    REPORTER'S CERTIFICATE
2       I, CHERYL O. SPRY, the undersigned Certified Court
3  Reporter, pursuant to RCW 5.28.010, authorized to
4  administer oaths and affirmations in and for the State
5  of Washington, do hereby certify:
6       That the sworn testimony and/or proceedings, a
7  transcript of which is attached, was given before me at
8  the time and place stated therein; that any and/or all
9  witness(es) were by me duly sworn to testify to the
10 truth; that the sworn testimony and/or proceedings were
11 by me stenographically recorded and transcribed under my
12 supervision, to the best of my ability; that the
13 foregoing transcript contains a full, true, and accurate
14 record of all the sworn testimony and/or proceedings
15 given and occurring at the time and place stated in the
16 transcript; that a review of which was requested; that I
17 am in no way related to any party to the matter, nor to
18 any counsel, nor do I have any financial interest in the
19 event of the cause.
20      WITNESS MY HAND AND DIGITAL SIGNATURE THIS 1st day
21 of OCTOBER, 2018.
22
23 _____
24 CHERYL O. SPRY
   Washington State Certified Court Reporter No. 2226
25 cspry@yomreporting.com
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com